IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:23-cr-00251-M-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | ORDER |
| KARIM BROWN, | ) ) | |
| Defendant. | ) ) | |

This matter comes before the court on the Defendant Karim Brown's ("Defendant") Motion for Judgment of Acquittal [DE 195] and the United States' response in opposition. Defendant contends that the government did not present sufficient reliable evidence at trial to establish beyond a reasonable doubt that he was the person who committed the offenses alleged. The court disagrees and denies the motion.

"A defendant may move for a judgment of acquittal … within fourteen days after a guilty verdict …." Fed. R. Crim. P. 29(c)(1). "Once a jury returns a guilty verdict, 'the court may set aside the verdict and enter an acquittal' if the court concludes that the evidence presented at trial is insufficient to sustain a conviction." *United States of Am. v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024) (quoting Fed. R. Crim. P. 29(c)(2)).

When considering a motion under Rule 29, "a trial judge, in passing upon a motion for a directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v.*

*Hall*, 396 F.2d 841, 844 (4th Cir. 1968) (citation omitted). A jury's verdict must be sustained "if, when the evidence is viewed in the light most favorable to the Government, 'the conviction is supported by substantial evidence.'" *United States v. Lunsford*, 629 F. App'x 518, 519 (4th Cir. 2015) (quoting *United States v. Hickman*, 626 F.3d 756, 762–63 (4th Cir. 2010)). "Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Straite*, 576 F. App'x 211, 213 (4th Cir. 2014) (quoting *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006)).

"Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *Freitekh*, 114 F.4th at 308 (quoting *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997)). "Thus, a defendant who challenges the sufficiency of the evidence 'bears a heavy burden.'" *Id.*

Here, Defendant was charged with one count of bank robbery, three counts of armed bank robbery, and three counts of brandishing a firearm during and in relation to a crime of violence. *See* Indict., DE 1. The jury returned a verdict finding Defendant guilty of all counts. DE 190. Defendant timely filed the present Rule 29 motion, asserting that

> the government has failed to prove that the robber was Karim Brown in each of the four robberies, beyond a reasonable doubt, for the following reasons: (1) robbery one – bank teller witness Ashley Johnson did not identify Mr. Brown in her written statement after the robbery but did orally to the police when the evidence showed Mr. Brown infrequently entered the PNC bank near his home; (2) robberies two through four – there was not any direct eye witness testimony by any of the bank employees that Mr. Brown was the robber and contradictions about the height and skin complexion of the robber were prevalent throughout the trial. Moreover, there were not any fingerprint identifications or DNA results returning positive as to Mr. Brown and this is after the government tried to claim the bank note from robbery three was recycled and used in robbery four. There was not any direct evidence that Mr. Brown was in possession of his cell phone during robbery one near his home, for the out-of-town robberies two and three, or that he was at the Fidelity Bank in Fayetteville for robbery four.

Mot., DE 195 at 1-2. Defendant is simply incorrect about the type and scope of evidence proffered at trial.

First Robbery: PNC Bank, December 24, 2021

Notwithstanding Defendant's contentions, the evidence presented to the jury for the first robbery included not only the testimony of the bank teller and Defendant's co-detainee, but also cell tower data indicating that the phones belonging to both Defendant and his co-Defendant, "Shiheem," were located in the area of the bank at the time of the robbery. Call data also showed that Defendant's phone called Shiheem's phone shortly before and after the robbery. The teller testified that she recognized Defendant when he walked into the bank on the day of the robbery, having remembered him, including his "northern accent," from previous encounters, but did not say hello because something seemed "off." She also testified that she pulled up Defendant's account information, including his name, birthdate, and address in Raeford, North Carolina, for the police the same day as the robbery. Further, the teller testified that the robber was approximately 5'3"-5'4" tall, and the prosecution introduced a video of the Defendant telling police he is 5'3" tall (Govt. Ex. 99). In addition, a still shot photograph was taken of the robber entering the bank at the time of the robbery, and the height strip reveals that he is between 5'0" and 5'6" tall.

On cross examination, the teller admitted that she did not name Defendant in her written statement to the police, she was not asked to look at photographs or a "line up" at the police station, and she was swabbed for DNA but did not recall whether she received the results. She also did not see a gun, although the note passed by the robber said he would "shoot." The teller confirmed that she had encountered Defendant five-to-six times prior to the robbery and remembered that he said

3

he had moved from Philadelphia for a "better life," had a daughter, and had recently applied for a job.

Defendant contends that the evidence reflects the teller mistook his identity, since he testified that he had been at the bank no more than six times, his mug shot reflects that he had neither bushy eyebrows nor a dark complexion, his bank statements reflect a different address in Fayetteville, and he testified that he does not have a daughter. Notably, the bank records reflect the Fayetteville address in statements dated late 2020 and early 2021, and the Raeford address in statements dated late 2021, which was during the time of the robbery. *See* Govt. Ex. 82, DE 195-1 at 69-76.

Defendant also challenges the testimony of Jonathan McLamb, who "had agreed to cooperate with the hope to receive a sentence reduction from his potential maximum sentence of ten years in prison." Mot., DE 95 at 4. McLamb testified that he was detained at the same time as Defendant in the same "pod" at Columbus County Detention Center, during which time Defendant came to "visit" him in his cell, asked McLamb whether he knew anyone who had gone to trial with the "feds," and told McLamb (in response to McLamb's questions) that he had robbed a bank where he was familiar with the teller, she gave him $4,000 with some dye packs, his co-Defendant was "Shiheem," and he drove away in an Impala. McLamb also conceded that he agreed to testify only pursuant to an agreement to cooperate with the United States, that he had a violent criminal history, and that he was hoping to receive a reduction of his sentence.

Defendant contends that McLamb's motivation to lie and incorrect information (i.e., no dye packs were provided to Defendant and Shiheem did not drive an Impala) demonstrate that his testimony was insufficient to support a guilty verdict.

4

The jury heard all of the prosecution's and Defendant's evidence regarding the first robbery—including testimony, documents, photographs, and cell phone data—weighed the credibility of the witnesses, and were permitted to draw reasonable inferences from the facts. The court finds that, viewing the evidence in the light most favorable to the government, Defendant's conviction for the first robbery is supported by substantial evidence in the record, including the teller's identification of the Defendant, the cell data placing Defendant's (and his co-Defendant's) cell phones in the area of the bank at the time of the robbery, and the consistent evidence of Defendant's 5'3" height as demonstrated by the photograph of the robber next to height strips and Defendant's own videotaped admission.

Second Robbery: First Bank, December 31, 2021

For the second robbery, Defendant challenges the testimony of the First Bank teller who was approached and robbed. The teller testified that she first encountered a man, later identified as Shiheem, who entered the bank at approximately 1:00 p.m. and asked to open an account. She asked for his identification and he left the bank, presumably to retrieve it from his vehicle. Shiheem returned, holding his cell phone up as if he were shooting a video, and said that he did not have his identification but would return. Ten-to-fifteen minutes later, the robber entered the bank; the teller did not see him enter, but first saw him when he was referred to her by another teller after he asked to open an account. She directed him to sit in the lobby and wait for her while she closed her window, but he turned around and handed her a note, saying, "no dye pack, just money, will shoot." A video shown to the jury depicts the robber resting his arm on the counter, pointing a gun with his left hand at the teller station, and talking to the tellers. After the teller put money from her first drawer into a bag, the robber said, "I know you have more." She put money from the second drawer into the bag; the robber then directed her to stand back and he told the

5

other teller to give him money from her drawers. The teller believed they had given the robber approximately $4,000. She described the robber as covered with a mask, hat, and coat, she could see only his eyes, and he appeared to be shorter than her 5'5" height. The video indicated that the robbery took about two minutes, from 1:33-1:35 p.m., and the teller did not see where he went when he left the building. The teller attested that she has never identified the robber.

On cross examination, the teller testified that she was not familiar with firearms and did not notice a laser on the robber's gun. She also spoke with police and was present during their investigation just after the robbery; she did not recall seeing them search for fingerprints or asking her or the other tellers for DNA swabs. Law enforcement did not ask her to attend a "line up," but she was shown photographs and, after confirming that she saw only his eyes, pointed to a photo of a person who "could possibly be" the robber. She testified that she remembered his round face shape more than his eyes and conceded that she was wearing heeled shoes at the time of the robbery.

In addition to the teller's testimony, the government presented photographs of the robber standing at the teller counter resting his elbows at about chest height and holding a gun in his right hand (Govt. Ex. 47), a still shot of a video from a different angle showing the robber standing on his tip toes at the counter (Govt. Ex. 109), and a photograph of a tape measure showing the counter height to be just over 4'5" tall (Govt. Ex. 48). The jury also saw evidence of cell site and location data showing that Shiheem's and Defendant's cell phones appeared to be in the area of the bank at the time of the robbery (Govt. Ex. 38). Furthermore, the jury heard testimony by FBI Agent Podrasky, who investigated not only photo and video extractions from Shiheem's cell phone, but also surveillance footage, jail calls, and Defendants' and witnesses' interviews. Through the

6

agent's testimony, the jury saw a video taken of Shiheem and Defendant[1] on the date of the second robbery, December 31, 2021, at about 9:54 a.m., in which they were driving together and wearing the same clothes as those depicted in the still photos from bank surveillance footage of the robbery (Govt Ex. 54). The agent testified that cell records demonstrate calls from Defendant's phone to Shiheem's phone just before (1:19 p.m.) and after (1:35 p.m.) the robbery (Govt. Ex. 49). The jury also saw a video of Shiheem in police custody identifying himself in the still shot depicting him standing at the teller counter on December 31, 2021 (Govt. Exs. 10, 100). In addition, the jury was shown photographs from Shiheem's phone of fanned-out cash taken at 1:49 p.m. (Govt. Ex. 55), and of Shiheem holding wads of banded cash at 9:06 p.m. (Govt. Ex. 89) on December 31, 2021.

The jury heard all of the evidence offered by the prosecution and Defendant regarding the second robbery—including the fact that the teller never identified Defendant, was not asked to give DNA, did not recall seeing law enforcement search for fingerprints, and did not know the type of gun the robber used—weighed the credibility of the witnesses, and were permitted to draw reasonable inferences from the facts. The court finds that, viewing the evidence in the light most favorable to the government, Defendant's conviction for the second robbery is supported by substantial evidence in the record, including the aforementioned video footage, photographs, and Shiheem's admission that he was at First Bank just prior to the robbery on December 31, 2021.

---

[1] Agent Podrasky testified that viewing the video frame-by-frame shows that the driver was, in fact, the Defendant, Karim Brown, who he identified as sitting in the courtroom.

Third Robbery: PNC Bank, January 14, 2022

Regarding the third robbery, Defendant challenges the testimony of all of the government's witnesses, saying it fails to constitute sufficient evidence on which a reasonable juror might fairly conclude Defendant is guilty beyond a reasonable doubt. The court disagrees.

First, the bank teller who was approached by the robber testified that the robber entered the bank and handed her a note that said, "no dye will shoot"; her bank does not have dye packs and she interpreted "dye" as "die." She said that the robber moved his coat so that she could see the firearm he was holding. After she placed money from her drawer into a plastic bag, the robber pulled his gun out and pointed it at the teller next to her when he directed that teller to give him money from her drawer; he did the same to a third teller on the other side. When the teller gave him the bag, the robber asked for the note back in a soft, calm voice, and the teller gave it to him. The teller recalled that the robber wore a white hat, face mask, and dark-colored jacket; she could only see his eyes and did not see his skin tone. The teller described the robber as short in stature, saying she is 5'4" tall, and confirmed that a still shot of a video showing the robber leaving the bank depicts his height as between 5'0" and 5'6" (*see* Govt. Ex. 62). The teller confirmed that she was never shown a line-up or taken to the police station, and she saw the police take fingerprints at the bank just after the robbery, but did not direct anyone to do so because she had recalled that the robber wore gloves. She conceded that she returned the note to the robber, but was able to identify the note shown to her during her examination as the same one passed to her by the robber.

Detective Matthew Jeslis testified that he responded to the January 14 robbery with his canine partner and attempted to follow the direction of the robber's path (south) to pick up a scent, but he was not successful. The detective also testified that he further investigated the robbery by searching for and reviewing video footage taken of the area near the bank at the time of the robbery.

8

The jury watched a video (Govt. Ex. 23) showing a person running across the parking lot at the Food Lion grocery store across the street from the bank, and entering the back seat of a dark-colored vehicle parked there. The vehicle appeared to be a Dodge Charger and the person who entered it was wearing clothes matching those worn by the robber.

Detective Megan Gray Doxsie testified that she investigated the January 14 robbery by reviewing footage from town cameras on public streets and highways that day. She observed what appeared to be the Dodge Charger and gleaned its license plate number from the video. The vehicle was registered to Mischa Hawkins, who informed police that she had loaned the vehicle to her niece, Shaquanna Wall.

Shaquanna Wall testified that, while the Dodge Charger was owned by her aunt, Wall was the primary user of the vehicle. However, Wall permitted her boyfriend, Antwan McLaughlin, to drive the car and he had it on January 14, 2022. She recalled that, one day while she was at work, her aunt called to say that police had questioned her about a robbery. Wall then asked McLaughlin to bring the vehicle to her workplace, and she drove it to the police station where it was seized and she was questioned.

Antwan McLaughlin testified that on January 14, 2022, he spent the day babysitting his cousin's children at his mother's house. His friend, Shiheem Brown, called and asked to borrow the Dodge Charger, saying he "needed to make some money"; McLaughlin agreed (having loaned his vehicle to friends in the past) and Shiheem arrived to pick up the keys and the vehicle. Shiheem returned the vehicle later that day with a full tank of gas. McLaughlin testified that sometime later, Wall called and told him that the police had asked about the Dodge Charger and its suspected involvement in a bank robbery. He drove the vehicle to Wall's workplace and later met with police. McLaughlin also testified that he asked Shiheem to meet him in person so that he could

look him in the eye and know whether Shiheem was telling the truth about what happened on January 14. McLaughlin met Shiheem at a "dirt bike shop" and Shiheem told McLaughlin that he knew nothing about a bank robbery. Defendant, who McLaughlin recognized as Shiheem's friend, arrived at the shop in a separate vehicle, exited the car, and fanned out a wad of cash. McLaughlin attested that he "felt played," was angry that Shiheem "lied" to him, and punched Defendant in the face, knocking him unconscious. McLaughlin also testified on cross examination that he did not see the Defendant on January 14, 2022, and never saw him enter any bank, and that, in January 2016, McLaughlin pled guilty to a charge of robbery with a dangerous weapon.

Detective William Hamilton testified that he investigated the January 14 robbery and was tasked with apprehending suspects Shiheem Brown and the Defendant. Hamilton was present at Shiheem's arrest at his apartment on January 27, 2022. After police arrived, Shiheem was observed going outside on his back deck and throwing a firearm into the woods behind the building. The firearm was retrieved and found to be loaded (Govt. Ex. 36). The jury was shown photographs in support of Hamilton's testimony that he believes the firearm appeared identical to the one brandished by the robber in the January 14 robbery. *Compare* Govt. Ex. 28 *with* Govt. Ex. 60. Hamilton also testified that he was present at the police station while Shiheem and Defendant were held after their arrests in adjoining rooms on January 27, 2022. The jury saw portions of videos from these rooms, during which Shiheem and Defendant spoke to one another, at one point exchanging "love yous" with each other. The jury also saw a video of police asking Defendant his height and Defendant's response, "I'm five three" (Govt. Ex. 100). On cross examination, Hamilton testified that the Fayetteville Police Department took possession of the firearm and he did not know to whom it was registered or whether it was tested for fingerprints or ballistics.[2]

---

[2] Following Hamilton's testimony, the jury heard from Emily Neavitt from Fayetteville Police

Further, the jury heard testimony that cell data from January 14, 2022, reflects that Shiheem's and Defendant's cell phones were in the area of the PNC Bank near the time of the robbery and that Defendant's phone called Shiheem's phone just before and after the time of the robbery (Govt. Exs. 38, 63, 64).

The court finds, viewing the evidence in the light most favorable to the United States, that the government produced substantial evidence supporting a fair conclusion beyond a reasonable doubt that Defendant was the robber of the PNC Bank on January 14, 2022, including the teller's physical description of the robber, the corroborating video and photographs, and Defendant's admission as to his height; the video and testimony supporting the United States' position that the Dodge Charger belonging to Shaquanna Wall was used during the robbery; the testimony and photographs demonstrating that the firearm seized from Shiheem was the same used during the robbery; Shiheem's and Defendant's own statements establishing their close association; and the cell data showing that Shiheem's and Defendant's cell phones were in the area of the bank at the time of the robbery.

Fourth Robbery: Fidelity Bank, January 21, 2022

Finally, for the fourth robbery, Defendant contends that the evidence presented is insufficient to prove beyond a reasonable doubt that he was the robber.

The jury heard first from one of the bank tellers robbed on January 21 at Fidelity Bank. The teller testified that the robber entered the bank, approached her window, asked about cashing a check, then handed her a note that said, "no dye will shoot." She identified the note from a

---

Department, who collected and processed the firearm. She testified that she photographed the gun, then swabbed it for DNA and fingerprints, but she did not know the results of the tests, which were conducted by a separate "analyst." Neavitt also attested that she ran a computer search on the firearm and found that it was not reported missing or stolen, and she clarified that a search of the firearm's owner would have been conducted by someone else.

11

photograph, which was also identified as the note used in the January 14, 2022 robbery (*see* Govt. Ex. 17). The robber pointed a gun at her, and she could see it "had a red dot." She described the robber as fully covered, including a face mask and a scarf draped on his head underneath a baseball cap, and she said he stood face-to-face with her at 5'5" tall. At one point, a manager walked out of her office and the robber turned toward her, pointed the gun at her, and directed her to move to one side of the teller counter where he could see her. The robber left with more than $15,000.00 from three tellers; thereafter, the police responded and the teller gave them the note and observed them dust for fingerprints, but she did not recall that they asked for DNA and they did not ask her to try to identify the robber by photographs or an in-person line up.

The bank's manager next testified that she was in her office when the robber entered and she heard him ask about cashing a check, then the teller state loudly, "we're good." The manager walked into the lobby and the robber turned to her, pointed his gun, and said "you out here now." She started to walk toward the entrance to the teller counter on her left, but the robber directed her to move to her right and in front of the counter. A still shot of the video depicting this movement shows the robber pointing his gun at the manager and a red laser dot on her chest (Govt. Ex. 21). She testified that the robber became agitated and moved around after he saw her, and she saw him point his gun, by means of the red dot, at each teller during the incident. She also testified that she is 6'1" tall and he appeared shorter than her at about 5'7" or 5'8", and she did not believe he could be shorter than 5'5" tall without the baseball cap on his head.

After hearing from two law enforcement officers involved in the seizure of Shiheem's cell phone and the extraction of data from the phone, the jury heard testimony by Harrison Putman, an FBI special agent and expert in the area of cellular record analysis. Putman explained how cellular phones work, in association with radio frequency signals and cell towers, and confirmed that data

12

from connections between phones and towers reflect only *approximate* locations of the phone at a particular time. As stated above, Putman testified about the cell data reflecting the approximate locations of, and calls made by, Shiheem's and Defendant's phones during the robberies. He also explained his analysis of the locations of Defendant's phone during dates and times he claimed to be at his workplace and at an automobile dealership.

Finally, through Agent Podrasky's testimony, the jury saw a video found on Shiheem's phone from January 12, 2022, depicting Shiheem in the passenger seat of a vehicle and Defendant driving the vehicle with one hand and holding a firearm in the other (*see* Govt. Ex. 57).[3] Podrasky testified that he believed the firearm held by Defendant appeared to match that used by the robber on January 21. *Compare* Govt. Ex. 57 *and* Govt. Ex. 69. Also, data from Shiheem's cell phone reflected a text from Defendant at 11:53 a.m., approximately 35 minutes before the robbery, asking "how's it looking" and Shiheem's response a few second later, "glass." Govt. Ex. 73. Shiheem's phone showed searches of "Bank of America" at 11:53 a.m.—a branch of which was located next to Fidelity Bank—and the phone logged a "significant location" at 11:54 a.m. at coordinates plotted north across the street from both banks (Govt. Ex. 91). A still shot from video footage at the bank depicts Shiheem standing at the teller counter at Fidelity Bank at 12:01 p.m. Govt. Ex. 18. Another still shot from the bank's video shows the robber entering the bank at 12:29 p.m., and the height strip next to him reflects he is between 5'0" and 5'6" tall (Govt. Ex. 68).

---

[3] Defendant contends that the photograph in this exhibit does not depict *his* left hand, on which is a substantial scar. DE 195 at 18 n.2. However, testimony and the video itself clarified that the still shot and video were a mirror image of the actual event; that is, Shiheem, the passenger in the vehicle, appeared to be on the right (or, driver's) side of the vehicle and the driver appeared to be on the left (or, passenger) side. With this explanation, the court and the jury understood that the driver was actually holding the firearm in his right hand.

13

Podrasky also testified regarding a video taken by Shiheem at 12:37 p.m. that day and a screen shot from the video showing Shiheem in the driver's seat of a vehicle and Defendant in the backseat sitting next to a pile of cash. Govt. Exs. 74, 75. Draped around Defendant's shoulders is a scarf appearing to be the same as that worn by the robber. Govt. Ex. 75. Also, around Defendant's neck is a face mask that appears to be the same as that worn by the robber. *See id.* The video shows Defendant moving quickly to remove the scarf from his shoulders. Govt. Ex. 74. Podrasky also testified that, in the background of the video, out the back window of the vehicle is a purple sign, identified as belonging to a church located approximately seven-to-eight minutes' drive from Fidelity Bank.

On cross examination, Podrasky agreed that the photograph of Shiheem holding cash in Govt. Ex. 89 might depict cash not "well cared for" like that used by drug dealers; that he had only observed one time—this time—when a robber used the same note to rob two banks; that the photograph of Defendant in the backseat of the vehicle shows paint stains on his pants, but the bank videos do not show paint stains on the robber's pants; that photographs of Defendant taken at the police station depict him standing 5'5"-5'6" tall; and that no DNA or fingerprint analyses tested positive for Defendant's fingerprints or DNA. Podrasky clarified on redirect that he was not surprised police found no fingerprints or DNA, since the robber wore at least one glove during each robbery and did not appear to touch any surfaces with his bare hand; that the bank videos were not clear enough to depict stains on the robber's pants; that a neck scarf found by police in the backseat of the Dodge Charger after it was seized was not the same scarf as that worn by the robber on January 21, 2022 (compare Govt. Ex. 110 with Govt. Ex. 69); and that he observed Defendant lift his heels when Defendant was measured at the police station.

14

The court finds this evidence, viewed in the light most favorable to the United States, supports a fair conclusion beyond a reasonable doubt that Defendant was the robber of Fidelity Bank on January 21, 2022.

Defendant's Evidence

Defendant presented testimony by several officers responsible for analyzing DNA and fingerprint tests taken at the banks; none of them returned positive results or results pointing to Defendant. In addition, a forensics examiner from Fayetteville Police Department, Devin Blake, testified regarding the photographs she took of the inside of the Dodge Charger; they revealed dark-colored clothes, some documents belonging to Antwan McLaughlin, and a neck scarf.

After considering the option overnight, Defendant chose to testify. He informed the jury that he did not always carry his cell phone and often permitted his children/grandchildren to "play" with it. Defendant also attested that he had started working at the Coca-Cola Bottling Plant on December 21, 2021, and he produced documents showing that he was in new employee orientation on December 21, a "new hire" from December 21-26, and "active" starting on December 27, 2021. Def. Ex. 14. Defendant also produced a copy of a handwritten timeslip offered to show that he was at work during the December 24 and December 31 robberies (Def. Ex. 15). Defense counsel advised that she did not obtain the timeslip directly from the employer but, rather, Defendant testified that he had taken a photograph of it to ensure that he had a record of his time before leaving.

Defendant also attested that he was at All American Auto, Inc. ("AAA") dealership on January 21, 2022, purchasing a Kia vehicle (*see* Def. Ex. 18). He stated that he had no driver's license, but he produced a copy of his North Carolina identification card which lists his height as 5'6" (*see id.*). Defendant attested that the salesperson told him he could not smoke marijuana on

15

the premises, so he walked up the road toward an area where he knew Shiheem was "making a play," or selling drugs. He explained that the 11:53 a.m. text he sent to Shiheem—asking, "how's it lookin" and Shiheem's response, "glass"—referred to Shiheem's sale of "ice" or crystal methamphetamine.[4] As Defendant walked, Shiheem drove up and Defendant got into the backseat (someone else was in the front seat) where a scarf was sitting on top of a pile of cash Defendant believed were the proceeds of the drug sale. He stated that, after he got in, he was putting *on* the scarf when Shiheem took the video and photograph. He also opined that he appeared "high" in the photograph and was smiling due to the marijuana he had just smoked. Defendant also testified concerning a photograph of his left hand showing a burn scar, and stated that when he was measured at the police station, he held the measuring tape down on the floor with his heel.

On cross examination, Defendant conceded that he was the driver in the January 12, 2022 video with Shiheem and that he was holding a "prop gun" (*see* Govt. Ex. 56, 57). Defendant also explained that his timesheet for his first week of work was handwritten because the "system" at Coca-Cola was "down," that he had seen none of his timesheets since the first week, and that, although he relied on the timesheet to show he was at work during the robberies, he did not call anyone at Coca-Cola to corroborate his story. Defendant also attested that he had his cell phone with him while at work on December 21, 22, and 27, 2021, but had it with him only half the day on December 24, 2021, and left the phone in Shiheem's car on December 31, 2021. He also stated that Shiheem had Defendant's phone on January 14, 2022, when he spent the day with his girlfriend, and that he was at the dealership on January 21, 2022. When asked about the photograph and video with Shiheem in the vehicle on January 21, Defendant stated that he put the scarf on and

---

[4] Defendant also averred that the text could not have referred to a bank because it occurred before the time of the photograph of Shiheem in the bank at 12:01 p.m. (*see* Govt. Ex. 18).

was not wearing a face mask; when the photograph was enlarged showing a face mask around his neck, Defendant stated that it did not appear to be the same mask worn by the robber. Defendant was then shown the post-robbery video from the vehicle (Govt. Ex. 74) and the still shot of the robbery, depicting that both he and the robber appeared to wear the same distinctive Nike mask on January 21, 2022. Defendant maintained that it was not him in the still shot.

Considering the totality of the evidence presented in this case, viewed in the light most favorable to the government, the court concludes that a reasonable juror could find Defendant's testimony less than credible and the evidence sufficient to determine Defendant guilty beyond a reasonable doubt of all four robberies. Defendant's evidence concerning the lack of direct evidence in the form of fingerprints and/or DNA is not required for a guilty verdict and was mostly explained by Defendant wearing gloves during the robberies and some ultimate findings of no prints or DNA. Defendant's testimony concerning his "alibis" during the robberies—i.e., he was at work, he was purchasing an automobile, and he did not have his phone at the time—was not corroborated by persuasive independent evidence. Defendant failed to raise a reasonable doubt as to his guilt for each of the four robberies.

In sum, Defendant has failed to meet his "heavy burden" under Rule 29. Sufficient evidence was presented at trial for a reasonable fact finder to conclude beyond a reasonable doubt that the United States established the Defendant's identity for each of the four robberies. Accordingly, Defendant's motion [DE 195] is DENIED.

SO ORDERED this \_\_\_1st\_\_\_ day of July, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

17